UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BOXART INC., and
DENNIS P. FISHER,

                    Plaintiffs,

        -against-

JACOBS FAMILY ADVISORS LLC,
QFS CAPITAL LLC, and
EVAN SAMLIN,
JOSEPH JACOBS a.k.a. Diego Velazco,

                  Defendants.

Case No.: 1:25-cv-10396

## COMPLAINT

Plaintiffs Boxart, Inc. (the "Company") and Dennis P. Fisher (collectively, "Plaintiffs"), by and through their attorneys, Heskin & Proper, PLLC, allege upon knowledge as to their own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This action arises out of a fraudulent and extortionate scheme perpetrated by Defendants Jacobs Family Advisors, LLC, QFS Capital, LLC, and Evan Samlin who operated and engaged in the making and collection of unlawful loans disguised as purchases of future receivables, commonly referred to as Merchant Cash Advances or "MCAs."

2.      Defendants pitched this scheme to Plaintiffs as a "consolidation loan" that would purportedly help Company by refinancing existing merchant cash advance ("MCA") obligations.

3.      These MCA Agreements were disguised as loans, due to the purchaser never taking control of and/or collecting the receivables themselves, laying off all the heavy lifting on

the borrower, combined with fixed repayment obligations, personal guarantees, and aggressive enforcement mechanisms, all in violation of federal and state law.

4.      Defendants used that pitch to induce Plaintiffs to enter a transaction structured in a manner that was economically unsustainable under reasonable operating conditions, extract massive upfront fees, and impose an extraordinarily high effective annual percentage rate approaching 298%, all while disguising the transaction as a "purchase of future receivables" to evade New York's usury and lending laws.

5.      Defendants structured the deal so Company would be locked into large, fixed weekly remittances, while the so-called "receivables purchase" label served as a veneer to conceal what was, in economic reality, a loan with absolute repayment characteristics.

6.      The deal could not be a true sale of receivables as a matter of basic logic and law because Defendants knew, before contracting, that Company had existing receivables-related financing arrangements, as one cannot purchase what has already been sold.

7.      Defendants nevertheless proceeded, precisely because they could not lawfully charge the interest and fees they intended to charge if the transaction were honestly documented as a loan.

8.      Defendants also employed a deceptive "carroting" pitch, i.e., inducing a business to enter a high-cost MCA transaction and pay substantial upfront fees by promising that doing so will lead to, or materially improve the likelihood of obtaining, a larger and lower-cost financing (including SBA-related financing), when the promised financing is not actually provided.

9.      Here, Jacobs, acting as broker for the QFS transaction, represented to Fisher/Company that entering into the QFS agreement and/or making payments thereunder

2

would place Plaintiffs in a better position to obtain an SBA-approved loan and that Defendants would assist in securing such financing.

10.     Those representations were material to Plaintiffs' decision to proceed. Plaintiffs relied on them in executing the QFS transaction and paying the associated upfront deductions and fees, only to be left with the high-cost remittance obligation and without the promised SBA financing.

11.     Similar 'carroting' schemes, where brokers solicit upfront payments by promising access to larger/lower-cost financing that never materializes, have been the subject of recent federal enforcement actions, including a 2025 criminal complaint filed in the District of New Jersey. Plaintiffs allege the same basic pitch and result occurred here.

12.     Further, Defendants' conduct also constitutes the collection of "unlawful debt" as defined in 18 U.S.C. § 1961(6), because the alleged MCA obligations were criminally incurred in connection with Defendants' business of lending money at usurious rates, unenforceable under state usury law and carried interest rates at least twice the maximum enforceable rate under New York law.

13.     Company, as a direct and proximate result of Defendants' misconduct, Company incurred financial harm and was subjected to unlawful and coercive payment demands, creating risk of non-compensable harm.

14.     Defendants' actions constitute a pattern of racketeering activity and/or the collection of unlawful debt in violation of RICO, including through the use of interstate wires and electronic banking systems to solicit, document, fund, and collect the unlawful obligations.

15.     This Complaint seeks damages and equitable relief under RICO, 18 U.S.C. §§ 1961 et seq., declaratory relief under 28 U.S.C. § 2201, and damages under New York law for negligence.

## THE PARTIES

16.     Plaintiff Boxart, Inc., is a corporation organized in the State of New York, with a business location of 79 N. 5th Street, Brooklyn, NY 11249. Company is the "Merchant" on the QFS merchant agreement at issue.

17.     Plaintiff Dennis P. Fisher ("Fisher") is a natural person and a citizen of the State of New York. Fisher is Company's principal and the primary contact for the transaction at issue and signed the merchant agreement and related guaranty/authorization documents presented by QFS.

18.     Defendant Jacobs Family Advisors, LLC ("Jacobs" or the "Broker") is a limited liability company organized under the laws of the State of Florida, with its principal place of business at 455 Fairway Dr., Ste 104, Deerfield Beach, FL 33441, that transacts business in New York, including within this District. Jacobs markets itself as an alternative finance/business funding & consulting shop, helping businesses with financing structures, cash-flow solutions, and M&A-type advisory, while the Better Business Bureau (BBB) lists offerings including merchant cash advance, factoring, equipment financing, consolidations, lines of credit, etc. Jacobs served as the broker/advisor that solicited Plaintiffs, recommended the transaction, and extracted substantial broker fees in connection with the deal.

19.     Defendant QFS Capital, LLC ("QFS"), is a limited liability company organized in the State of Delaware, file #2410809, registered as a foreign corporation in the State of New York and in the State of Florida, with its principal place of business located at 110 E. Broward

Blvd., Ste 1550, Fort Lauderdale, Florida 33301-3553, with a registered agent and address listed

as Cogency Global, Inc, 850 New Burton Road, Suite 201, Dover, DE 19904, phone 800-483-

1140. QFS transacts business in New York, including within this District. QFS (including

through "QFS Capital, LLC" as reflected on the agreement) funded the transaction, drafted and

provided the form agreements, and collected (or attempted to collect) payments through fixed

remittances and aggressive enforcement mechanisms.

20.    Defendant Evan Samlin ("Samlin") is a natural person who, upon information and

belief, is a citizen of Florida. Upon information and belief, Samlin is a managing member,

officer, and/or controlling principal of QFS Capital, LLC, and at all relevant times directed,

supervised, authorized, and/or participated in the solicitation, documentation, funding, servicing,

and collection of the transaction at issue, including fee deductions and ACH debits directed at

Plaintiffs in New York.

21.    Defendant Joseph Jacobs, also known as Diego Velazco ("Jacobs (Individual)"),

is a natural person who, upon information and belief, served as CFO of Jacobs Family Advisors,

LLC. Upon information and belief, he used the name 'Diego Velazco' in communications with

Plaintiffs relating to the conduct alleged herein. He is sued in this action as Joseph Jacobs a/k/a

Diego Velazco.

## JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because

this action arises under the laws of the United States, including the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (including claims based on the

collection of unlawful debt), as well as the civil-remedy provision of RICO, 18 U.S.C. § 1964(c).

23.     This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal RICO claims.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including (among other things) Defendants' solicitation and contracting activity directed into New York, their use of New York forum and governing-law provisions, and their collection efforts directed at Plaintiffs in New York.

25.     Venue is also proper because the QFS agreement contains New York governing-law and New York forum/jurisdiction provisions consenting to litigation in New York.

26.     This Court has personal jurisdiction over each Defendant because each Defendant transacts business in New York, including within the Southern District of New York; committed tortious acts in New York and/or directed tortious acts into New York causing injury within this State; and purposefully availed themselves of the privilege of conducting activities in New York and of the benefits and protections of its laws, such that the exercise of jurisdiction over them in this forum is consistent with due process. (see Exhibit 1 – QFS MCA Agreement)

## COMMON FACTUAL ALLEGATIONS

**A.      The Predatory MCA Industry.**

27.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."

28.     As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock."

6

29.     Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with no financial background whatsoever.

30.     As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."

31.     The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." Id.

32.     As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.

33.     There's no license you need to file for.

34.     It's pretty much unregulated."  Id.

**B.      The Sham.**

35.     Many states, like New York, have laws prohibiting predatory interest rates.

36.     In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables."

37.     MCA companies, rather than making loans to merchants, promote a fiction that they are purchasing at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts.

38.     The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables.

39.     But the picture they paint is contrary to reality.

40.     By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences, as well as collect receivables from their customers that MCA companies supposedly purchased.

## C.     The Bloomberg Awakening.

41.     For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners.

42.     That all changed on November 20, 2018, when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.

43.     As a direct result of the light shone on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

44.     Congress also took notice on June 26, 2019, when the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: The Small Business Story."

45.     As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.

46.     Regulators have also acted, when on July 31, 2020, the New York Attorney General sued a group of MCA companies, as well as their principals, alleging that their MCA Agreements constitute criminally usurious loans.

47.     On July 31, 2020, the Securities and Exchange Commission shut down an MCA company.

48.     In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."

49.     The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.

50.     On June 10, 2020, the Federal Trade Commission filed a complaint against John Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs.

51.     On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.

52.     Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*

53.     On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA Agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.

54.     On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on

future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."

55.     On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."

56.     As Gretchen Morgensen of NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.

**D.      The MCA Agreements are Substantively and Procedurally Unconscionable.**

57.     The MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arm's-length.

58.     Instead, the MCA Agreements contain one-sided terms that prey upon merchants and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

59.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (4) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (5) a personal guarantee, the revocation of which is an event of default, (6) a jury trial waiver, (7) a class action waiver, (8) a collateral and security

agreement providing a UCC lien over all of the merchant's assets, (9) a prohibition of obtaining financing from other sources, (10) the maintenance of business interruption insurance, (11) an assignment of lease of merchant's premises in favor of the MCA company, (12) the right to direct all credit card processing payments to the MCA company, (13) a power-of-attorney to settle all obligations due to the MCA Company and (14) a power of attorney authorizing the MCA company to "file any claims or taken any action or institute any proceeding…"

60.     The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.

61.     Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

62.     The MCA Agreements are also unconscionable because they impose repayment structures that are economically unsustainable for operating businesses.

63.     Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse change, financial or otherwise, in such condition, operation or ownership of Merchant.

64.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.

65.     Among these improper penalties, the MCA Agreements (1) entitle the MCA company to attorneys' fees, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all its receivables if it misses just one fixed daily payment.

66.     The Daily Payments under each of the MCA Agreements described below were fixed and absolute and each of the agreements' reconciliation provisions were a sham.

67.     Defendants did not maintain reconciliation departments and did not have any one trained or otherwise dedicated to performing any reconciliation of a merchant's accounts.

68.     Indeed, the MCA Agreements did not contain any functioning contact information whereby Plaintiffs could even request a reconciliation within the terms of that provision.

69.     The terms of the reconciliation provisions further reveal the sham.

**E.      The Enterprise Intentionally Disguised the True Nature of the Transaction.**

70.     Despite the documented form, the Transaction is, in economic reality, a loan that is absolutely repayable. Among other hallmarks of a loan:

(a)  The Daily Payments were fixed, and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time.

(b)  The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing.

(c)  While the agreements purport to "assign" all the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables

including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount.

(d)  The transaction was underwritten based upon an assessment of the merchant's credit worthiness, not the creditworthiness of any account debtor.

(e)  The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value.

(f)  The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid and not based upon any good-faith estimate of the merchant's future account receivables.

(g)  The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements.

(h)  The Enterprise required the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)  The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

71.    Following the exposure of MCA practices in federal enforcement actions and media reports on "boiler room" operations, companies such as Dynasty Capital 26 LLC, Legacy Capital 26 LLC, Unlimited Funding Group LLC, and their affiliates, continued to operate as

high-interest lenders masquerading as "funders." Their operations are often aided by ISO

brokers, who act as unregistered middlemen compensated by commissions per transaction rather

than by legitimate service.

## FACTS SPECIFIC TO COMPANY

### 1.    Plaintiffs' Capital Needs and Defendants' "Consolidation" Pitch

72.     Prior to the transaction at issue, Company had existing receivables-related

financing arrangements. Plaintiffs were seeking refinancing amidst broader market headwinds

affecting the art services sector in 2025.

73.     Jacobs, acting as a broker/advisor, marketed and pitched a purported

"consolidation loan" that would allegedly help Company by streamlining or resolving its prior

obligations. Jacobs presented itself as acting in Plaintiffs' interests and recommended the

transaction with QFS as the solution.

74.     Jacobs operated as an MCA broker/ISO and lead generator that solicited

merchants seeking working-capital financing, including New York businesses, for placement

into high-cost "sales-based financing" transactions, including transactions funded by QFS.

Jacobs' role was to identify and target merchants facing liquidity stress, gather underwriting

materials (including revenue information), present "consolidation" pitches, and steer merchants

into transactions carrying extreme effective interest and fee burdens, while collecting a

transaction-based commission.

75.     In Company's case, Jacobs solicited and advised Plaintiffs in connection with the

QFS transaction, held itself out as an advisor offering a "consolidation" solution, transmitted

and/or presented the QFS offer terms to Plaintiffs, and induced Plaintiffs to proceed with the

transaction despite Company's existing MCA obligations and the predictable cash-flow strain the

QFS weekly remittance structure would impose. Jacobs was paid a substantial broker fee in connection with the transaction.

76.     Jacobs' compensation structure created a direct financial incentive to close the transaction regardless of suitability, affordability, or the merchant's ability to sustain the remittance schedule, and Jacobs' conduct was a substantial factor in inducing Plaintiffs to accept an arrangement that operated as an absolutely repayable, usurious lending transaction in economic reality.

77.     In truth, the QFS transaction was not designed to support Company; it was designed to extract enormous fees up front and impose large payment obligations.

**2.      The Transaction's Core Terms, Fees, and Extraordinarily High APR**

78.     On or about July 31, 2025, Defendants caused Plaintiffs to execute a "Merchant Agreement for the Purchase and Sale of Future Receipts/Accounts Receivable" with QFS (the "Agreement"), documented as a "sales-based financing" or "receivables purchase" arrangement. (see Exhibit 1 – QFS MCA Agreement)

79.     The Agreement and Offer Summary reflect, among other things: (a) funding provided to Plaintiffs of approximately $895,199.89; (b) an estimated total payment amount of approximately $1,412,531.23; and (c) an annual percentage rate of approximately 297.07%—an extraordinarily high rate that understates the transaction's true cost when broker and lender fees are included. (see Exhibit 2 – QFS Offer Summary)

80.     The Offer Summary further itemizes substantial upfront charges, including an origination fee paid to QFS of approximately $47,115.84 and a broker fee paid to Jacobs of approximately $113,077.89, among other prepaid charges.

81.     The Agreement requires fixed weekly remittances (approximately $38,211.58 weekly) and was structured around a short estimated term (approximately 185 days), imposing immediate working capital pressure on a business operating amidst broader market headwinds affecting the sector in 2025.

82.     The Agreement also contains add-on "fees" and punitive charges that further evidence the transaction's one-sided nature (including "no stacking" and "blocked account" fee provisions and related penalties), and enforcement mechanisms designed to coerce payment rather than reflect any true purchase risk.

**3.      The "Receivables Purchase" Label Was a Sham Disguising a Loan**

83.     Although Defendants labeled the transaction a purchase of receivables, the economic reality was a loan.

84.     The structure imposed fixed repayment obligations and treated any shortfall as a default, hallmarks of debt rather than a true sale.

85.     The purported "reconciliation" concept in MCA form agreements is routinely used as a pretext to claim the purchaser assumes sales risk, but in practice such provisions are often illusory and do not function as genuine risk-sharing. Here, the fixed weekly remittance, short term, heavy fees, and default remedies reveal the true nature of the deal as absolutely repayable debt.

86.     Defendants also knew the transaction could not be a true purchase of receivables because Company had existing receivables-related financing arrangements.

87.     Defendants proceeded anyway, demonstrating that they were not "buying receivables" in any commercially meaningful sense; they were extending and collecting a high-interest loan while mislabeling it to evade usury law.

16

88.     The purported "sales-based" structure was illusory in practice, as Company's primary operating account was subjected to repeated, scheduled electronic debits by multiple MCA funders at the same time, confirming that repayments functioned as fixed debt service rather than a true, risk-based purchase of receivables.

89.     For example, Company's Chase business account activity reflects repeated MCA withdrawals and "stacked" debits from multiple funders during the relevant period, including Parkside, Fresh Funding, Pinnacle, and others, in addition to QFS.

90.     The same account records reflect that QFS repeatedly withdrew fixed amounts by ACH debit as "QFS CAPITAL LLC," including withdrawals of $7,642.31 (coded "SEC: CCD" / "DESCR: 8022"), demonstrating fixed repayment behavior inconsistent with any genuine purchase-risk model.

91.     These withdrawals were taken even while Company was simultaneously facing heavy ACH traffic and carefully managing liquidity, further confirming that the "reconciliation" concept was not operating as a meaningful risk-sharing mechanism but as a collection tool for an absolutely repayable obligation.

**4.      Procedural and Substantive Unconscionability**

92.     The Agreement was procedurally unconscionable: it was presented to Plaintiffs as a take-it-or-leave-it contract of adhesion with no meaningful opportunity to negotiate, under circumstances of severe pressure and informational imbalance.

93.     The Agreement was substantively unconscionable: it imposed grossly one-sided terms, including an effective APR around 298%, massive upfront broker and origination fees, fixed weekly remittances, and punitive default/fee provisions that function as penalties.

94.    These features are consistent with agreements designed to fail and to force default, rather than to reflect a bona fide purchase of receivables.

**5.    Impact and Damages**

95.    Defendants' transaction did not help Company. It materially reduced Company's working capital through high weekly payments and fees.

96.    Plaintiffs' damages include (a) the amounts paid in excess of the amounts received, including but not limited to all upfront charges, broker fees, origination fees, and other deductions/charges, and (b) damages for the lost value of the business. Plaintiffs also seek attorneys' fees and costs as permitted by RICO.

<u>**DAMAGES**</u>

97.    As a direct and proximate result of Defendants' conduct described above, Plaintiffs have suffered substantial injury to business and property, including out-of-pocket losses.

98.    Plaintiffs seek as damages all amounts paid in excess of the amounts actually received in connection with the transaction, including but not limited to upfront and deducted charges such as broker fees, origination fees, and any other fees, charges, penalties, or costs imposed by Defendants or paid to Defendants' agents in connection with the Agreement and its funding, servicing, and collection.

99.    Plaintiffs' damages include not only the overpayments and upfront charges described above, but also the predictable downstream banking losses and operating dislocations caused by Defendants' fixed-withdrawal structure, including bank fees and service charges incurred as Company made scheduled remittances.

100.    Company's financial statements further document that, following the QFS transaction, the business carried a large recorded liability associated with QFS (reflecting the burden imposed by the transaction).

101.    Company's profit-and-loss statement reflects substantial "Interest Expense" during the relevant period, as well as a specific accounting entry reflecting "QFS Deployment Liability," consistent with the severe economic cost of the transaction and its downstream effects.

102.    Plaintiffs' damages also include the increased personal exposure and consequential harms inflicted on Fisher as Company's principal.

103.    The exact amounts are expected to be established through discovery and proven at trial, including from Defendants' records reflecting all debits, deductions, fees, and collections.

104.    Plaintiffs will seek all recoverable damages consistent with the causes of action alleged below, including all available statutory, treble, and other relief, together with attorneys' fees, costs, and interest where permitted by law.

## RICO ALLEGATIONS

105.    Defendants Jacobs, QFS and Samlin associated together for a common purpose: to solicit merchants seeking working-capital financing with "consolidation" pitches, paper unlawful loans as purported receivables purchases, extract outsized broker/origination fees, and collect unlawful debt through fixed remittances and coercive enforcement.

106.    This association-in-fact enterprise (the "Enterprise") had an ongoing structure, including coordinated solicitation (broker), standardized contract documentation (lender), shared financial incentives (fees and yield), and collection mechanisms (scheduled remittances and enforcement).

107.     The Enterprise operated through a division of labor. Jacobs functioned as the Enterprise's solicitation and placement arm: it generated leads, marketed and pitched purported "consolidation" financing, collected merchant financial materials, and funneled merchants seeking working-capital financing to QFS for funding under standardized "receivables purchase" paperwork.

108.     QFS functioned as the Enterprise's funding and documentation arm: it provided the capital, drafted and supplied standardized form agreements and authorizations, imposed fixed remittance schedules and default remedies, and collected payments through scheduled electronic withdrawals and enforcement mechanisms.

109.     Samlin functioned as a directing and supervisory participant in the Enterprise by overseeing and directing, directly or indirectly, the funding, documentation, and collection practices used to originate, service, and collect upon the unlawful obligations, including through standardized forms and scheduled electronic debits.

110.     Jacobs' brokerage services were not ancillary or incidental. Jacobs was an integral participant in the Enterprise's operation because it was the front-end channel through which merchants were solicited and induced to enter the transactions, including by presenting the transaction as a beneficial "consolidation" solution while the economic reality was an unaffordable, fee-laden, absolutely repayable obligation.

111.     As per their own website jacobsfamilyadvisors.com, their "About us" section on their home page states: (1) "At Jacobs Family Advisors, we are committed to providing custom financial solutions that match your business needs. Our transparent approach and dedication to your success ensure that you receive trustworthy guidance for continued growth."; (2) "Client-Focused: Putting the needs and goals of clients first, offering personalized financial solutions

tailored to their specific situations.; and (3) Integrity: Maintaining honesty and transparency in all financial consultations, upholding the trust of clients through ethical business practices." Jacobs held itself out as providing 'transparent' and 'client-focused' guidance, and Plaintiffs relied on those representations in treating Jacobs as an advisor. (see Exhibit 3 – JacobsFamilyAdvisors.com Home Page)

112.    Jacobs and QFS shared a common purpose and financial incentives: the successful placement and funding of high-cost transactions that generated (i) upfront fees and deductions (including broker compensation and origination-type charges) and (ii) ongoing collections through fixed remittances.

113.    Jacobs' commission-based compensation was tied to closing the transaction, aligning Jacobs' interests with QFS's collection interests rather than with the merchant's financial interests.

114.    The Enterprise engaged in interstate commerce and used the instrumentalities of interstate commerce, including emails, telephone communications, electronic signature platforms, wire transfers, and ACH debits to solicit, contract, fund, and collect the unlawful obligations.

115.    The debt Defendants sought to collect constitutes "unlawful debt" within the meaning of 18 U.S.C. § 1961(6) because it was incurred in connection with Defendants' business of lending money in substance; it is unenforceable in whole or in part under New York law (including, at minimum, criminal usury principles applicable to disguised loans); and the interest/charges exceeded at least twice the maximum enforceable rate.

21

116.    Defendants' conduct also involved repeated uses of interstate wires in furtherance of a deceptive scheme to mischaracterize the transaction's true nature, cost, and consequences (including the "consolidation" pitch and the disguising of a loan as a receivables purchase).

### FIRST CAUSE OF ACTION
**(RICO – 18 U.S.C. § 1962(c))**

117.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

118.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprise

119.    Defendants, through their coordinated conduct, jointly operated and managed an enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of an association-in-fact of individuals and entities engaged in a shared purpose: the deceptive and fraudulent extension, enforcement, and collection of unlawful merchant cash advances.

120.    The enterprise had an ongoing structure and continuity, including but not limited to shared funding sources, similar contract templates, coordinated enforcement practices, and a network of communications used to further the scheme.

121.    Defendants functioned as a unit, with each participant playing a specific role in the common course of conduct designed to defraud merchants and circumvent usury and lending laws.

### RICO PREDICATE ACTS

122.    Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5), including:

    a.    Extortion under the Hobbs Act, 18 U.S.C. § 1951;

    b.    Collection of Unlawful Debt, 18 U.S.C. § 1961(6);

    c.    Wire Fraud, 18 U.S.C. § 1343;

123.    (Wire Fraud Particulars – 18 U.S.C. § 1343). Defendants devised and intended to execute a scheme to defraud merchants, including Plaintiffs, by inducing them to enter transactions documented as "purchases of future receivables" but structured and enforced as absolutely repayable, fee-laden loans with usurious and unconscionable effective rates.

124.    On or about July 31, 2025, Jacobs (acting as an MCA broker/ISO) solicited and communicated into New York to Fisher and Company (located in Brooklyn, New York) to pitch the QFS transaction as a "consolidation" solution and to induce Plaintiffs to proceed with the transaction and accept the proposed remittance terms and fee structure.

125.    On or about July 31, 2025, QFS, including through Samlin and/or at his direction and/or through agents acting for QFS, transmitted and caused to be transmitted into New York by interstate electronic means the key transaction terms and documentation, including the Merchant Agreement and Offer Summary (see Exhibits 1 and 2).

126.    Plaintiffs executed the transaction documents from New York through electronic means, and these transmissions and the use of electronic execution platforms and email/telephone communications were material to consummating the transaction and implementing the scheduled remittance and enforcement structure.

127.    Defendants further used interstate wires and electronic banking systems to carry out the scheme by transmitting funds for the transaction by electronic transfer and then initiating and processing repeated electronic withdrawals from Plaintiffs' New York bank account(s) to collect fixed remittances, including ACH debits identified as "QFS CAPITAL LLC".

128.    The interstate wire communications and electronic withdrawals were used not only to induce Plaintiffs to enter the transaction, but also to service and collect upon the unlawful

obligation through fixed remittances and default-driven enforcement mechanisms inconsistent with a true receivables purchase.

129.    Plaintiffs relied on Defendants' deceptive pitch and documentation by proceeding with the transaction, and Plaintiffs suffered damages as a direct and proximate result, including excessive fees and collections and downstream banking harm Company as alleged herein.

## A.    Culpable Persons

130.    Evan Samlin is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

131.    Samlin is the Managing Member of the midsize company defendant QFS Capital, LLC, which upon information and belief has between 10 - 40 employees.

132.    Joseph Jacobs a.k.a Diego Velazco is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

133.    Joseph is the CFO of Jacob's Family Advisors and upon information and belief, Joseph Individual conducted and participated, directly and indirectly, in the affairs of the Enterprise through his role in soliciting Plaintiffs, transmitting and/or causing the transmission of deal terms and documents, and obtaining fees and payments in connection with the unlawful transaction described herein.

## B.    The Enterprise

134.    Defendants Jacobs Family Advisors, LLC, QFS Capital, LLC,  and Samlin constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

135.    The Enterprise is associated-in-fact through ongoing business relationships, contractual arrangements, and coordinated conduct for the common purpose of carrying on an ongoing unlawful enterprise.

136.    Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

137.    It is believed since August 2024 and continuing through to the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

138.    The Enterprise consists of at least the following entities: Jacobs Family Advisors, LLC, QFS Capital, LLC, Joseph Jacobs a.k.a Diego Velazco, and Evan Samlin.

139.    The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

140.    The Enterprise's conduct included repeated uses of interstate wires and electronic banking systems as described in ¶118–¶123, including emails, electronic execution of transaction documents, wire transfers, and ACH debits in furtherance of the scheme.

141.    Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**C.      The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise**

142.    The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit, in order to accomplish the common goals and purposes of collecting unlawful debts including as follows:

### i.      The Enterprise Principal: Evan Samlin

143.    Evan Samlin is a Managing Member of the Enterprise.

144.    He is responsible for the day-to-day operations and success of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

145.    In his capacity principal, Samlin is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the weekly payments via ACH withdrawals; and (iii) the form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.

146.    All such forms were used to make and collect unlawful loans including, without limitation, loans extended to Plaintiffs.

147.    As Managing Member, Samlin took actions and coordinated, caused, and directed other enterprise associates in furtherance of the overall goals and purposes of the Enterprise,

including, but not limited to the origination, servicing, and unlawful collection of MCA Agreements, the overcollection of funds and exorbitant fees from Plaintiffs account.

148.    Samlin has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Enterprise members.

### ii.    The Enterprise MCA Companies:  Jacobs Family Advisors and QFS Capital, LLC

149.    Jacobs Family Advisors, LLC and QFS Capital, LLC maintain officers, books, records, and bank accounts independent of the other Enterprise members ("the Enterprise MCA Companies").

150.    The Principals have operated the Enterprise MCA Companies as part of an unlawful enterprise to collect upon unlawful debt and to engage in racketeering activity, including the repeated use of interstate wires and electronic banking systems as described herein.

151.    Pursuant to their membership in the Enterprise, the Enterprise MCA Companies have: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's fraudulent and usurious loan transactions, and participation agreements with Investors to fund such loans; (ii) pooled the funds of Investors in order to fund each fraudulent, usurious loan; (iii) underwritten the fraudulent and usurious loans, determining the ultimate rate of interest and repayment structure under each; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the fraudulent and usurious loans; (vi) set up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtained judgments and settlements in its name to further collect upon the unlawful debt.

**E.    Interstate Commerce**

152.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

153.    Specifically, members of the Enterprise maintain offices in Florida and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

154.    In the present case, all communications between the members of the Enterprise and the Enterprise MCA Companies were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.

155.    Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the agreements, fund the advances under each of the agreements and collect the payments via interstate electronic ACH debits.

156.    In addition, at the direction of Defendants, each of the agreements were executed in the state of New York, by Plaintiffs', at their offices in New York, via electronic mail/electronic signature.

**F.    Injury and Causation**

157.    Plaintiffs have been and will continue to be injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c), including through the collection of unlawful debt and the pattern of racketeering activity alleged herein, in an amount to be determined at trial.

158.     Such injuries include, without limitation, improper fees and upfront deductions, amounts collected through the remittance/ACH structure, associated bank fees and operational dislocations, and other business losses to be proven at trial.

159.     Plaintiff Company was forced to make weekly payments pursuant to the MCA Agreements that amounted to unconscionable interest rates.

160.     Under controlling New York law, the MCA Agreements are void ab initio.  See Adar Bays, LLC v. GeneSYS ID, Inc., 2021 WL 4777289 (N.Y. Oct. 14, 2021).

161.     Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy to Violate RICO – 18 U.S.C. § 1962(d))

162.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

163.     Defendants knowingly agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity and/or the collection of unlawful debt, and Defendants knowingly joined and participated in that agreement, in violation of 18 U.S.C. § 1962(d).

164.     Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs to collect upon unlawful debts, including the Agreement, thereby agreeing to violate 18 U.S.C. § 1962(c).

165.     Each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the

orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

166.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through the use of interstate wires and electronic banking systems, including emails, telephone communications, electronic signature platforms, wire transfers, and ACH debits, to solicit, document, fund, service, and collect the unlawful obligations, including the Agreement.

167.    The participation and agreement of Defendants and each Enterprise Member was necessary to allow the commission of this scheme.

168.    Plaintiffs have been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

169.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments and lost profits.

170.    Plaintiffs were forced to make weekly payments pursuant to the MCA Agreements that amounted to unconscionable interest rates.

171.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

172.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

<u>**THIRD CAUSE OF ACTION**</u>
**(Declaratory Judgment – 28 U.S.C. § 2201)**
**(Against Defendant QFS Only)**

173.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

174.    An actual, present, and justiciable controversy exists between Plaintiffs and QFS concerning the rights and obligations under the Agreement, including QFS's claimed right to enforce and collect under a transaction that Plaintiffs contend is void and unenforceable.

175.    Plaintiffs seek a declaration that the Agreement is a disguised loan, not a true sale of receivables, and is unenforceable because it is procedurally and substantively unconscionable, and because it was structured to evade New York's usury and lending laws through mislabeling and oppressive terms.

176.    Plaintiffs further seek a declaration that, because the receivables purportedly "purchased" had already been sold/encumbered to numerous other MCA companies at the time of contracting (a fact known to Defendants), the "purchase" characterization is commercially and legally false, further confirming the transaction's illegality and unenforceability.

177.    Plaintiffs request declaratory and related relief, including (a) a declaration that the Agreement is void and unenforceable, (b) a declaration that QFS has no right to collect amounts beyond any lawful recovery (if any), (c) an order directing termination/release of any UCC lien or security interest filed or maintained in connection with the Agreement, and (d) such further relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### (Negligence and Breach of Fiduciary Duty)
### (Against Defendant Jacobs Family Advisors, LLC Only)

178.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

179.    Jacobs was in a unique position of trust and owed Plaintiffs a fiduciary duty.

180.    Jacobs held itself out as an advisor acting in Plaintiffs' best interests

181.    Jacob acted with gross negligence and in reckless disregard of Plaintiffs' rights by inducing Plaintiffs to enter into a knowingly criminally usurious loan with QFS.

182.    Jacobs knew that Plaintiffs had already entered into other MCA agreements.

183.    Jacobs, an experienced MCA broker, knew or should have known that each of those MCA agreements contained anti-stacking clauses prohibiting Plaintiffs from further encumbering their receivables or entering into additional MCA agreements.

184.    Jacobs further knew or should have known that the transaction was a disguised loan in violation of New York usury laws.  Among other things, the loan disclosed an interest rate of 298% on its face, and openly charged finance charges and retained upfront prepaid finance fees that increased the actual interest rate beyond 298%.

185.    Jacobs further knew or should have known that it placed Plaintiffs in default from day one by breaching various representations and warranties that Plaintiffs knew would be invoked by the lender if they missed a payment.

186.    Jacobs placed its own financial interest above Plaintiffs by not disclosing these risks.

187.    Jacobs further failed to disclose that it received a higher commission in the event that it was able to induce Plaintiffs into paying a higher interest rate.  In other words, Jacob failed to disclose that it made more of Plaintiffs paid more.

188.    As a direct result of Jacob's breach of its fiduciary duties and duty of care, Plaintiff entered into the QFS agreement, which has caused substantial harm to Plaintiffs.

189.    Jacobs undertook to advise, broker, and recommend financing to Plaintiffs, including recommending and arranging the QFS transaction as a purported "consolidation" solution.

190. In doing so, Jacobs owed Plaintiffs a duty to exercise reasonable care and competence under the circumstances, including to avoid steering Plaintiffs into a transaction that Jacobs knew or should have known was predatory.

191. Jacobs breached its duty, including by:

    a. Recommending and brokering a transaction with a very high effective APR and massive hidden/upfront charges;

    b. Failing to adequately disclose and explain the true economic reality of the transaction as a loan with fixed repayment pressure and default-driven coercion;

    c. Collecting substantial broker compensation in connection with a deal that was contrary to Plaintiffs' interests, without reasonable safeguards, diligence, or warnings;

    d. Steering a merchant into a structure that was predictably unsustainable.

192. Jacobs' negligence was a direct and proximate cause of Plaintiffs' damages, including amounts paid in excess of amounts received (including upfront broker and origination charges).

193. Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial, plus such other relief as the Court deems proper.

**FIFTH CAUSE OF ACTION**
**(Fraud)**

194. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

195.    Defendants made material misrepresentations to Plaintiffs regarding the nature of the transactions, the legitimacy of underwriting and ACH-processing fees, and the potential for SBA loan approval.

196.    Plaintiffs reasonably relied upon Defendants' statements and suffered pecuniary losses, including, excessive fees, and the loss of promised financing.

197.    The MCA Agreement contained an appendix setting forth sham fees chargeable to Plaintiffs.

198.    The Defendants, improperly deducted broker, nonessential underwriting fees and/or an "ACH Origination Fee," totaling $160,193.73 to cover the cost of origination and ACH setup.

199.    This fee was fraudulent as it was simply a ploy to extract additional funds from the Plaintiffs and did not actually comprise related expenses pertaining to origination.

200.    None of these fees had any relationship to any services actually rendered and instead were disguised as interest charges.

201.    The MCA Agreement represented that these fees were for services or costs purportedly provided by or incurred by the Enterprise MCA Companies in connection with their respective agreement, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the MCA Agreement and the so-called "fees" were nothing more than additional profits reaped by the Enterprise MCA Companies under the MCA Agreement. The Enterprise MCA Companies knew that their representations concerning the nature and purpose of the Underwriting Fee were false and misleading at the time they entered into the MCA Agreements.

202.    These false representations were made to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the Purchased Amount of the MCA Agreements were legitimate fees charged to offset the costs of services provided by the Enterprise MCA Companies under the MCA Agreements.

203.    Plaintiffs reasonably relied upon these representations in entering into the MCA Agreements and, ultimately paying, the fees through either the Weekly Payments or "refinancing" their payment obligations with additional advances by the Enterprise MCA Companies.

204.    In addition, on or about July 29, 2025 in text messages directed into New York, Jacobs, acting as the broker that solicited Plaintiffs into the QFS transaction, represented to Fisher/Company that entering the QFS agreement would [improve/secure] Plaintiffs' ability to obtain an SBA-approved loan and that [Jacobs/QFS] would [assist in obtaining / place / arrange] such SBA financing, stating "I understand you might be hesitate but know that this process is the best for obtaining secured term loans/SBA". (see Exhibit 4 – Text Messages from Diego pg. 1)

205.    Those statements were false and misleading when made, and were made to induce Plaintiffs to execute the QFS transaction and pay the associated fees.

206.    Jacobs made the SBA-loan representations in furtherance of the QFS placement and within the authority conferred by QFS as part of the brokered transaction, including QFS's acceptance of the referral, transmission of transaction documents for Plaintiffs' execution, funding of the transaction, and payment of broker compensation to Jacobs in connection with the placement.

207.    Plaintiffs reasonably relied on these representations in proceeding with the transaction and, as a direct and proximate result, suffered damages including the upfront

deductions and fees, amounts collected under the remittance schedule, and the loss of the promised opportunity for SBA financing.

208.    By reason of the foregoing, Plaintiffs are entitled to compensatory damages in an amount to be proven at trial, together with pre- and post-judgment interest, attorneys' fees where recoverable, and such other and further relief as the Court deems just and proper.

## EXHIBITS

Exhibit 1 – QFS Merchant Agreement

Exhibit 2 – QFS Offer Summary

Exhibit 3 – Jacobs Family Advisors .com Home Page

Exhibit 4 – Text messages with Joseph Jacobs (CFO Jacobs) a.k.a. Diego

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against all Defendants, jointly and severally, and grant the following relief:

   i.    On the First Cause of Action, awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c), plus attorneys' fees and costs;

   ii.   On the Second Cause of Action, awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c), plus attorneys' fees and costs;

   iii.  On the Third Cause of Action, entering declaratory relief that the Agreement is void and unenforceable, and granting related relief including release/termination of any security interest or UCC filing tied to the Agreement;

   iv.   On the Fourth Cause of Action, awarding Plaintiffs compensatory and punitive damages against Jacobs in an amount to be determined at trial;

   v.    Awarding pre- and post-judgment interest as permitted by law; and

vi.    Awarding such other and further relief as the Court deems just and proper.


Dated: New York, New York
          December 15, 2025

                                          HESKIN & PROPER, PLLC

                                          By: /s/ Shane R. Heskin
                                          Shane R. Heskin
                                          641 Lexington Avenue, 14th Floor
                                          New York, New York 10022
                                          shane@heskinproper.com
                                          Attorney for Plaintiffs